## 35078. HAMILTON v. THE STATE.

UNDERCOFLER, Presiding Justice.

Paul Roland Hamilton appeals from a sentence of death imposed on August 1, 1978, following his conviction for the murder of John Shinall committed on May 14, 1977, in Chatham County. Following conviction, the jury found the following aggravating circumstances: The offense of murder and other offenses were outrageously vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim, and further found that the offense of murder was committed while the offender was engaged in the commission of another capital felony.

The state presented evidence authorizing a jury to

find Hamilton and a girl friend, Billie Jean Rose, met and began drinking with the victim in a Thunderbolt bar, the Sidepocket Inn, on Saturday around 2 p.m. They left around 4 p.m. and went to the Warehouse Tavern, another lounge. Later, Shinall suggested they go to his house to watch t. v., rest, eat and then visit some more bars. At Shinall's apartment, Billie Jean Rose testified she left the men in the living room and tried to prepare some steaks. After 30 minutes, she went to the living room to ask how the men wanted the steaks prepared. The lights were out. Hamilton told her not to turn them on, but she did. Then she saw Hamilton stab Shinall twice. She fled out the back door, picking up a small puppy owned by Shinall when she left. Hamilton took Shinall's wallet, a t.v. and stereo belonging to Shinall and put them in the victim's car. The couple fled Savannah, after abandoning Hamilton's car, and spent the night around Atlanta. They disposed of the t. v., stereo, and later the dog, for cash. In Kentucky, they joined a carnival and soon thereafter Billie Rose was fired for withholding funds from the operator. She went to her home in Kirby, Texas. Hamilton stayed with the carnival.

Meanwhile, Shinall's body was found by police on May 19, 1977, following a complaint by the upstairs tenants of a "bad odor" in the apartment below. Detectives summoned thoroughly investigated the crime scene and testified the victim was found in a sitting position leaning against a living room couch, nude from the waist down. The victim's pants were lying across an end of the couch, his shoes nearby and they found a shirt and t-shirt with blood and a hole in them. The couch was covered with blood; a broken vase was lying partially under the victim's head and there was a shattered Pepsi-Cola bottle on the floor. These glass particles contained blood and hair samples similar to the victim's. No fingerprints were found on any evidence. A social security identification tag, but no wallet, was found in the trousers. A pair of panties with a heart on them, later identified as belonging to one of Shinall's common law wife's daughters, was also found on the floor near the couch. The detectives testified the scene showed signs of a struggle. The parties stipulated the death of the victim, including the

additional facts that the body was in an advanced state of decomposition when found, and that an autopsy showed two primary injury areas: the head with several underlying hematomas and a perforation of the left chest, the latter causing death. The shirt and undershirt found with the body each had a hole consistent with the chest wound.

Billie Jean Rose, Hamilton's girl friend who testified for the state, was located when her mother called the chief of police in Kirby, Texas, and told him her daughter had said she witnessed a murder. Detective Pendergraph went to Texas and interviewed this witness. Following verification of her facts and a second autopsy on the victim's body following exhumation, warrants were issued for Hamilton. He was arrested and returned to Savannah on August 24, 1977. He was interviewed that afternoon about 4 p.m. He received the Miranda instructions, voluntarily waived his rights, and answered questions freely. In an initial statement, he said he was invited to Shinall's house, went into the bedroom and "passed out," awakening when Billie Jean Rose called for help. He said he found Shinall and his girl friend half-dressed and his "mind went blank." He swung Shinall around and hit him on the "shoulder bone" with his fist and the victim fell to the floor. He stated he left and wanted to walk back to get his car, but Billie Jean, who he said stayed inside the house a long time, came out sounding "scared" carrying the victim's t. v. and stereo and said they had to take Shinall's car and leave. "To this day, she's never told me what made her nervous . . . the last time I seen the man, he was conscious as I am right now." Advised by the detectives he had not told the truth, Hamilton, following a restatement of the Miranda instructions, gave a second, conflicting statement, stating he and "B. J." decided to "hustle" Shinall for "lots of money and no problems — we were all drinking . . ." He reiterated he went to sleep and was awakened by B. J.'s cry for help. She was on the couch with "nothing on . . ." She said, "Help me! My mind went blank. . ." He said B. J. hit Shinall with the bottle but he didn't know who she was aiming at. "I got mad and kept hitting him . . ." He estimated he hit him "5 or 6 times with my fist." He also

stated there was "some type of knife . . . I stabbed the man with it . . ." Hamilton said the last time he saw the knife,[1] it was sticking in his chest. Hamilton checked the billfold, took the dog, t. v. and stereo, took the victim's car and fled to Atlanta. He sold the dog for $10, the t. v. and stereo for $60. He concluded by saying he didn't know the man died. These statements were read into the record without objection.

Billie Jean Rose testified, refuting all allegations by Hamilton that Shinall made any sexual advances toward her. She stated when they arrived at the Shinall apartment, the men went in the living room; she went to the kitchen to prepare some steaks, caused a small fire on the stove that she put out and then she returned to the living room to ask how the men wanted their steaks prepared. The lights were out. Hamilton told her not to turn the lights on, but she did. She saw Hamilton stab Shinall twice. She fled out the back door with Shinall's puppy and Hamilton came out later with the t. v. and the stereo, took the victim's car and they fled.

The state relied upon the theory that Hamilton went to Shinall's house with the intention of robbing the victim, killing him in the process. After the killing, Hamilton partially disrobed Shinall and placed the panties on the floor to give substance to his story that the victim was attempting to rape "B. J." Hamilton, who did not testify and offered no evidence in his defense, proceeded upon the theory that he was justified in killing Shinall to protect his girl friend from rape.

A final witness for the state, Cora Henderson, Shinall's common law wife, testified and corroborated Bellie Jean Rose's testimony that the panties found near the couch were not hers. This witness testified the panties belonged to her young daughter.

The trial court charged the jury on malice murder, felony murder, voluntary manslaughter, not guilty by reason of justifiable homicide and not guilty. Counsel for defendant had no objections respecting the charge, stating he thought "that's a pretty accurate summary,

---

[1]The knife was never found.

your honor."

Following conviction, the state presented evidence in aggravation as follows: Dr. Larry Howard, Director of the State Crime Lab, testified Shinall's body exhibited four blunt traumas and four stab wounds. The first stab wound was in the left chest. It went through both shirts, the ribs and penetrated the heart. There was a stab wound on the right side of the head, penetrating the lobe of the ear and another penetrated the cartilage of the ear into, but not through the skull. There was fourth stab wound in the right side of the head near the top in the back. Also, a blunt instrument had lacerated the scalp to the bone on top of the head, on the side over the right ear and on the right side of the head toward the back. In Dr. Howard's opinion, the blows caused unconsciousness and caused considerable bleeding. The stab wounds were caused by a blunt-ended, sharp weapon. Hamilton offered no evidence in mitigation.

The court charged the jury they must first determine if an aggravating circumstance existed before they would be authorized to find the death penalty. He charged they must find the existence of either or both of the following statutory aggravating circumstances existed beyond a reasonable doubt: (1) The offense of murder was committed while the offender was engaged in the commission of another capital felony or aggravated battery. (2) The offense of murder was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind, or an aggravated battery on the victim. He specifically charged that the jury was to review all the evidence presented by the state and the defendant throughout the trial, including evidence in mitigation which was defined.

The jury found the existence of both aggravating circumstances charged and recommended the death penalty. We affirm.

1. The evidence set forth, ante, was sufficient to support the verdict. A rational trier of fact could have found proof of guilt beyond a reasonable doubt. Enumerations 1 — 4 are without merit.

2. The trial court did not err in excusing the juror, Mr. Baker, for cause where, as here, he stated he could

never vote for capital punishment regardless of what the evidence showed. Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968); *McCorquodale v. Stynchcombe,* 239 Ga. 138, 145 (4) (236 SE2d 486) (1977). Enumeration 5 is without merit.

3. Felony murder was a proper charge under the evidence submitted by the state showing the victim's wallet containing some $100, a television set, a stereo, and a small puppy, were stolen following the brutal slaying and the defendant's incriminating statement, read into the record at trial, that he intended to "hustle lots of money and no problems" from the victim prior to going to the victim's home. The jury could reasonably find from the evidence beyond a reasonable doubt that Hamilton knocked Shinall unconscious and stabbed him to death during the commission of the robbery. Code Ann. § 26-1902; *Edwards v. State,* 233 Ga. 625 (212 SE2d 802) (1975). See also *Hicks v. State,* 232 Ga. 393 (207 SE2d 30) (1974) and *Moore v. State,* 233 Ga. 861, 864 (213 SE2d 829) (1974). Enumeration 6 is without merit.

4. The appellant's contention that the "Report of the Trial Judge," filed as required by Code Ann. § 27-2537(a), deprived him of an independent and impartial review of his conviction is not supported by citation or statement of how he was harmed thereby. Enumeration 7 is without merit.

5. We find the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor; that the evidence supports the jury's findings that this murder was vile, horrible or inhuman in that it involved an aggravated battery to the victim and that the offense of murder was committed while the offender was engaged in the commission of another capital felony. The sentence is not disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. Code Ann. § 27-2537. In reviewing the sentence, we considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed, and we find the following similar cases listed in the appendix support affirmance of the death penalty. The evidence supports the aggravating circumstances found by the jury.

We have also reviewed the trial court's charge on the sentence and find it complies with *Fleming v. State,* 240 Ga. 142, 146 (240 SE2d 37) (1977) and *Hawes v. State,* 240 Ga. 327, 334 (240 SE2d 833) (1977).

*Judgment affirmed. All the Justices concur.*

ARGUED JULY 9, 1979 — DECIDED SEPTEMBER 6, 1979.

*John F. M. Ranitz, Jr.,* for appellant.

*Andrew J. Ryan, III, District Attorney, Michael K. Gardner, Assistant District Attorney, Arthur K. Bolton, Attorney General, Mary Beth Westmoreland, Staff Assistant Attorney General,* for appellee.

APPENDIX.

Similar cases considered by the court: 1. *Johnson v. State,* 226 Ga. 511 (175 SE2d 840) (1979); 2. *Pass v. State,* 227 Ga. 730 (182 SE2d 779) (1971); 3. *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1974); 4. *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975); 5. *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); 6. *Bowden v. State,* 239 Ga. 821 (238 SE2d 905) (1977); 7. *Spraggins v. State,* 240 Ga. 759 (243 SE2d 20) (1977); 8. *Holton v. State,* 243 Ga. 312 (253 SE2d 736) (1979).